Peter J. **BRENNAN**, Secretary of Labor, U. S. Department of Labor, Plaintiff,

v.

Donald H. **JAFFEY**, Individually and trading as Colony North Enterprises, Defendant.

Civ. A. No. 74–7.

United States District Court, D. Delaware.

Aug. 7, 1974.

Ralph F. Keil, U. S. Atty., and John H. McDonald, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Steven D. Goldberg, Theisen, Lank & Mulford, Wilmington, Del., for defendant.

## OPINION

STEEL, Senior District Judge:

This action is brought by plaintiff, the Secretary of Labor, to enjoin the defendant, Donald H. Jaffey, individually and trading as Colony North Enterprises, from allegedly continuing to violate the minimum wage (29 U.S.C. §§ 206 and 215(a)(2)), overtime (29 U.S.C. §§ 207 and 215(a)(2)), and record keeping (29 U.S.C. §§ 211(c) and 215(a)(5)), provisions of the Fair Labor Standards Act, and to restrain the defendant from withholding wages and compensation alleged to be past due. The defendant has moved for summary judgment upon the ground that:

"[T]his Court lacks jurisdiction as defendant has no employees engaged in commerce or in the production of goods for commerce or employed in an enterprise engaged in commerce or in

the production of goods for commerce within the meaning of the Act."

The contention that the Court lacks jurisdiction is without merit. 29 U.S.C. § 217 confers jurisdiction upon the Court to decide the controversy. Whether or not summary judgment should be granted is the real issue which this Court, in the exercise of its jurisdiction, must resolve.

The motion is before the Court upon the unverified pleadings, an affidavit of Donald H. Jaffey in support of the motion and an affidavit of Thomas C. Samworth, an official of the Department of Labor, in opposition to the motion.

Whether the defendant is entitled to summary judgment must be determined as a matter of law by accepting as true any facts, whether denied or admitted, stated in the Samworth affidavit, by accepting as true any undenied facts stated in the Jaffey affidavit, and by accepting as true any facts alleged in the complaint which are admitted in the answer. On this premise, the following facts must be accepted as true for the purpose of the motion:

The defendant is engaged in the business in Delaware of leasing and operating apartments which he conducts from a central location and for a common business purpose. The business has had an annual dollar volume of rental income of not less than $250,000. The defendant employs a maintenance supervisor who oversees a number of maintenance workers. Most of the latter are assigned to a particular apartment complex although a few are assigned to apartment complexes as the need arises. Paragraphs 5–13 of the Jaffey affidavit read:

"5. The maintenance supervisor is responsible for purchasing cleaning supplies such as soap, mops and brooms, hammers, nails, screws, screwdrivers and similar impliments. (sic) The supplies are purchased from local retail and wholesale outlets, some supplies are purchased directly from manufacturers. From time to time maintenance workers also purchase these supplies from local retailers as needed.

6. Maintenance workers clean apartments at the end of tenancies and prepare them for new tenants. They occasionally do touch-up painting, but major painting is done by independent contractors.

7. Maintenance workers perform minor plumbing repairs such as unblocking pipes and drains or changing washers. Major plumbing work is presently done by independent contractors. Before October 1, 1973 most plumbing including minor plumbing repairs was done by independent contractors.

8. Maintenance workers perform minor carpentry such as replacing doors and other minor repairs including dry wall and tile. Before October 1, 1973 most carpentry work including minor carpentry work was done by independent contractors.

9. Maintenance workers perform minor electrical repairs such as changing light switches. Major electrical work is presently done by independent contractors. Before October 1, 1973 most electrical work including minor electrical repairs was done by independent contractors.

10. Maintenance workers clean sidewalks, parking lots, swimming pools, cut grass and do other work commonly done by apartment maintenance workers.

11. Major repairs to heaters and air conditioners are now generally done by independent contractors, while maintenance workers do some minor repairs. Before October 1, 1973 most heating and air conditioning work including minor repairs to heaters and air conditions (sic) was done by independent contractors.

12. All maintenance supplies which come into the hands of maintenance workers are used by the workers to maintain and repair defendant's prop-

erties. They are not given or sold to any third party.

13. In 1973 the defendant spent approximately $10,700 on maintenance supplies."

The Samworth affidavit states that the affiant conducted a full investigation of the business activities of the defendant, and that his efforts revealed that:

" . . . Defendant's maintenance employees regularly handled cleaning supplies, replacement fixtures, and other goods and materials regularly purchased from two suppliers located in Philadelphia, Pennsylvania—Stan Martin Building Maintenance Supplies, Haworth and Edgmont Streets, Philadelphia, Pennsylvania, and Pier-Angeli Co., Inc., 550 Church Lane, materials so ordered and handled by Yeadon, Pennsylvania. The plumbing Defendant's employees included but were not limited to plumbing fixtures, shower heads, splash guards, toilet seats, repair kits, faucets, ballcocks, aerators, solder and plunger assemblies. Such supplies were installed in tenants' apartment units. The cleaning supplies so ordered and handled by Defendant's employees included but were not limited to rug shampoo, key blanks, caulking, acrylic floor finish, wax stripper, deodorant, sponges, Spic & Span, wood and furniture polishes, flood lamps, light bulbs, glues, window clearners, ice cube trays, oven sprays, and insecticides. . . .

The total dollar cost of the cleaning supplies and plumbing fixtures purchased from Philadelphia suppliers was $3185.64 in 1973."

In an earlier case, Brennan v. Apartment Communities Corporation, 360 F. Supp. 1255 (D.Del.1973) [1], this Court had before it the question whether the Act applied to the owner of several apartment complexes whose maintenance employees purchased and handled supplies which were used in the apartment operations. All the purchases were charged directly to the defendant employer. The supplies consisted of articles used for cleaning, such as soap, mops, and brooms and occasional supplies of paint, paint brushes, hammers, nails, screws, screwdrivers and similar instruments and were acquired from hardware stores located near the apartments but generally had origins outside of the state.

When *Apartment Communities* was decided, and at present, the minimum wage, overtime and record keeping provisions of 29 U.S.C. §§ 206, 207 and 211 applied to employers who employed employees in an "enterprise engaged in commerce or in the production of goods for commerce." In *Apartment Communities*, as here, the employees were employed in an "enterprise" within the meaning of 29 U.S.C. § 203(r).

The question in *Apartment Communities*, as here, was whether the enterprise (apartment house operation) was one which had employees "engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s). That section includes employees engaged in "handling, selling, or otherwise working on goods that have been moved in or produced for commerce." [2] When the *Apartment Communities* case was decided, as at the present time, a critical word in § 203(s) was the meaning of "goods". "Goods" are defined in 29 U.S.C. § 203(i) as:

" . . . goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after

---

1. Cross appeals from the decision were dismissed by stipulation of the parties.

2. A second requirement for coverage under the Act is that the enterprise have an annual gross volume of sales made or business done not less than $250,000. 29 U.S.C. § 203(s)(1). In *Apartment Communities*, as here, this requirement was met.

their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

This definition of "goods" has continued without change since its original enactment in 1938.

In *Apartment Communities* this Court held that because the supplies were purchased on the account of the defendant and were handled by his agents, the maintenance personnel, the supplies had come into the actual physical possession of the defendant who was their "ultimate consumer", and since he was not a "producer, manufacturer or processor" of the supplies, they were not "goods" as defined in § 203(i). Upon the basis of this reasoning the Court concluded that the provisions of the Fair Labor Standards Act were not applicable to the defendant. Contrary to the argument of plaintiff, nothing in the legislative history prior to 1974 suggests a construction of the Act at variance with the conclusion arrived at in the *Apartment Communities* case.

The plaintiff at bar concedes that the *Apartment Communities* decision was rendered on "virtually identical facts" to those involved in the present case (PB 6) [3], but argues that the decision must be reevaluated because of a "trend of authoritative precedent" (PB 9) in conflict with it. Two of plaintiff's cited decisions, Brennan v. Dillion, 483 F.2d 1334 (10th Cir. 1973) and Brennan v. State of Iowa, 494 F.2d 100 (8th Cir. February 26, 1974) were rendered after this Court's opinion dated May 22, 1973 in *Apartment Communities*.

*Dillion* theorizes that because an apartment house owner acquires supplies from out of state sources which are handled and used by his employees for the benefit of the tenants, who pay rent for their apartments, the apartment owner thereby resells the supplies to the tenants and they, and not the owner, are the "ultimate consumers" of the supplies. This approach led the Court to conclude that the maintenance employees were engaged in the handling of "goods". This reasoning, it seems to this Court, is unrealistic and reflects a tortured interpretation of the meaning normally attributed to the "ultimate consumer" concept. See fn., *supra*, p. 377. In *State of Iowa* the "ultimate consumer" issue received only cursory consideration.

Neither *Dillion, State of Iowa*, nor any of the other decisions which plaintiff has brought to the Court's attention (many of which were discussed in *Apartment Communities*) convinces the Court that *Apartment Communities* was erroneous. Accordingly, the Court would be disposed to grant the defendant's motion for summary judgment upon the basis of the reasoning in *Apartment Communities* but for one fact which has come about since the opinion was decided.

That fact is the passage by Congress of an amendment to § 203(s) [4] which

---

3. At page 9 of the plaintiff's brief a possible distinction between the *Apartment Communities* case and the instant one is suggested since here the employees handled and installed toilet seats, shower heads, plumbing components and light bulbs, whereas such did not appear to be the case in *Apartment Communities*. This is not a relevant factual distinction. There is no evidence that the tenants either purchased or acquired title to any of these items. It is unrealistic to treat any portion of the rent which they paid as the purchase price for the items. Presumably the tenants had only a right to use the items during the tenancy with a termination

of that right upon the expiration of the tenancy. The defendant, the apartment owner and employer, and not the tenants, was the "ultimate consumer" of those items within the meaning of § 203(i). Cf. Phillips v. Star Overall Dry Cleaning Laundry Co., 149 F.2d 416, 419 (2nd Cir. 1945), cert. denied 327 U.S. 780, 66 S.Ct. 677, 90 L.Ed. 1008 (1946).

4. Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6(a)(5) (April 8, 1974); 29 U.S.C.A. § 203(s) (Supp. June 1974).

became effective on May 1, 1974. As amended § 203(s) reads:

" 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, *or* employees handling, selling, or otherwise working on goods *or materials* that have been moved in or produced for commerce by any person. . . . " (Emphasis added).

Prior to the amendment § 203(s) read as follows:

" 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, *including* employees handling, selling, or otherwise working on *goods* that have been moved in or produced for commerce by any person. . . . " (Emphasis added)

In the absence of any enlightenment as to what Congress intended to accomplish in 1974 when it amended § 203(s) to include "materials", the amendment would be ambiguous at best. Nowhere in the Act are "materials" defined in express terms. Section 203(i), however, defines "goods" to include "articles or subjects of commerce of any character". This broad definition seemingly encompasses "materials" and equates "goods" and materials" as meaning the same thing. However, the Senate Report of the Fair Labor Standards Amendments of 1974, Sen.Rep.No.93–690, 93d Cong., 2d Sess., purports to explain why "materials" was written into section 203(s) in 1974 at p. 17:

"The bill also adds the words 'or materials' after the word 'goods' to make clear the Congressional intent to include within this additional basis of coverage the handling of goods consumed in the employer's business, as, *e. g.* the soap used by a laundry. The 'handling' language was added based on a retrospective view of the effect of substandard wage conditions.

While the original Act recognized the effect of such conditions on subsequent interstate *out*flow of products, it was not until the 1961 amendments that Congress specifically recognized their effect on the prior interstate *in*flow, based on the 'obvious economic fact that demand for a product causes its interstate movement quite as surely as does production' (107 Cong.Rec. 6236). See H.Rept.No.75, 87th Cong., 1st Sess. (1961), pp. 3, 8; S. Rept.No.145, 1st Sess., pp. 3–4; 107 Cong.Rec. 5841, 6234, 6236, 6240–6241. Although a few district courts have erroneously construed the 'handling' clause as being inapplicable to employees who handle goods used in their employer's own commercial operations (See, e. g., Shultz v. Travis-Edwards, Inc., 320 F.Supp. 384 (sic) (D.La.), revs'd on other grounds 465 F.2d 1050 [C.A. 5], cert. den. [409 U.S. 1076], 93 S.Ct. 685 [34 L.Ed.2d 665]; Shultz v. Wilson Building, Inc., 320 F.Supp. 664 (S.D.Tex.), aff'd on other grounds 478 F.2d 1090 (C.A. 5), cert. den. [414 U.S. 855], 94 S.Ct. 156 [38 L.Ed.2d 105]; the only court of appeals to decide this question, Brennan v. Dillion, 483 F.2d 1334 (C.A. 10), and the majority of the district courts have held otherwise (See e. g. Hodgson v. Rivermont Corp. d/b/a Fox Meadows Apartments, 71 CCH Lab.Cas. ¶ 32,898 (M.D.Fla.); Hodgson v. David M. Woolin & Son, 20 WH Cases 91, 64 CCH Lab.Cas. ¶ 32,527 (S.D.Fla.); Sharp v. Warner Holding Co., 70 CCH Lab.Cas. ¶ 32,821 (D.C. Minn.1972); Mansdorf v. Ernest Tew Associates, 69 CCH Lab.Cas. ¶ 32,775 (M.D.Fla.1972); Hodgson v. Howard d/b/a Howard Cleaners, 69 CCH Lab. Cas. ¶ 32,777 (N.D.Ala.1972); Wirtz v. Washeterias, S.A., 304 F.Supp. 624, 59 CCH Lab.Cas. ¶ 32,116 (D.Canal Zone 1968); Hodgson v. Keller d/b/a Plaza Laundromat & Dry Cleaning, 20 WH Cases 1073, 70 CCH Lab.Cas. ¶ 32,848 (D.Ohio 1973); Shultz v. Union Trust Bank of St. Petersburg, 307 [297] F.Supp. 1274 (M.D.Fla.

1969) and the addition of the words 'and materials' will clarify this point."

The language of the Report indicates that Congress by the amendment meant only to "clarify" the meaning which it believed § 203(s) had theretofore rather than to expand its pre-existing coverage. Thus the Report points to two cases which were decided prior to the amendment, Shultz v. Wilson Building, Inc., 320 F.Supp. 664 (S.D.Tex.1970), aff'd on other grounds sub nom. Brennan v. Wilson Building, Inc., 478 F.2d 1090 (5th Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 156, 38 L.Ed.2d 105 (1973) and Shultz v. Travis-Edwards, Inc., 320 F. Supp. 834 (W.D.La.1970), rev'd on other grounds sub nom. Hodgson v. Travis-Edwards, Inc., 465 F.2d 1050 (5th Cir.), cert. denied, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972), and states that they erroneously interpreted the Act. While *Apartment Communities* was not referred to in the Report, its holding was essentially the same as those portions of *Travis-Edwards* and *Wilson Building* disapproved of by the Report. Hence it may be fairly said that *Apartment Communities* was at variance with the view which Congress expressed in 1974 as to the meaning of the Act prior to 1974. Further, the Report points to *Dillion* and other district court decisions[5] with seeming approval which it interprets as holding contrary to *Travis-Edwards* and *Wilson Building*.

The statement in the 1974 Report concerning the meaning of § 203(s) enacted 13 years earlier and implicitly, a reference to § 203(i) enacted 36 years earlier, is of little value. The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one. United States v. Price, 361 U. S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960). In examining legislative history as an aid to harmonizing the Clayton Act and the Sherman Act, the United States Supreme Court noted: "How members of the 1914 Congress may have interpreted the 1890 Act is not of weight for the purpose of construing the Sherman Act." United States v. Wise, 370 U.S. 405, 414, 82 S.Ct. 1354, 1360 8 L.Ed.2d 590 (1962).

The 1974 Report, however, is of considerable significance in ascertaining what was intended when the amendment became effective May 1, 1974, by inserting the word "materials" in § 203(s). It clearly discloses a legislative purpose to make the minimum wage, overtime and record keeping provisions of the Act applicable to employers, such as the defendant, after its effective date. Its actual effect was therefore to expand its future coverage, and not to give the Act prior to May 1, 1974, a meaning at variance with the interpretation which this Court placed upon it in *Apartment Communities*.

Partial summary judgment dismissing the complaint insofar as it purports to allege violations of the Act prior to May 1, 1974 is hereby granted; summary judgment as to possible violations after May 1, 1974 is hereby denied.

Submit order.

---

5. Most of these were discussed and distinguished in *Apartment Communities*.