Ray MARSHALL, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

Howard WHITEHEAD and James
Whitehead, Defendants.

No. 75–6–Civ–Ft.M–Y.

United States District Court,
M. D. Florida,
Fort Myers Division.

May 19, 1978.

James H. Woodson, Counsel for Employment Standards, Dept. of Labor, Atlanta, Ga., for Department of Labor.

George E. Allen, Allen, Knudsen, Swartz, DeBoest, Rhoads & Edwards, P.A., Fort Myers, Fla., for defendants.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

This action is brought by the Secretary of Labor, under Section 17 of the Fair Labor Standards Act, 29 United States Code, Section 217, to enjoin the defendants, Howard

Whitehead and James Whitehead, doing business as Whitehead Farms, from allegedly violating the overtime [1] and record keeping provisions [2] of the Act, and to restrain the defendants from withholding wages and compensation allegedly due certain employees. The Court has jurisdiction of the parties and the subject matter of this action pursuant to 29 United States Code, Section 217.

The matter was tried before the Court without a jury solely on the issue of whether defendants' employees are covered under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. Sections 201, *et seq.* As established by pretrial order of the Court, if the Court's determination upon the evidence presented on the liability issue is that defendants are covered by the Act, then a subsequent hearing will be held for presentation of evidence concerning the remaining issues of whether defendants also violated the record keeping provisions of the Act, whether the violations were willful, and to establish the amounts of overtime compensation owed to defendants' employees.

Basically, the defendants conduct a local fill dirt operation, hauling and dumping fill dirt obtained from local borrow pits, base rock, and other materials to contractors, developers, and other individuals for use on various construction projects. The defendants also perform clearing, spreading, and grading services in connection with their fill dirt operations.

In the course of their operations, the defendants employ individuals as mechanics, truck drivers, equipment operators (pan, loader, grader, dragline), mechanic's helpers, laborers and a bookkeeper. The parties stipulated that for the time period under consideration, the defendants' employees received and handled locally purchased petroleum products, including gas and oil, and mechanical parts used in the maintenance and repair of the vehicles and equipment used in defendants' business, which had travelled in interstate commerce.

The action arises under Section 7(a)(1) of the Act which prohibits an employee working more than 40 hours in a workweek unless the employee is paid time and one-half for the hours worked in excess of 40. Specifically, the issue for resolution in the liability phase of this case is whether the defendants' operation constitutes an enterprise engaged in commerce or in the production of goods for commerce.

For the greater part of the time period involved in this case,[3] the relevant statutory provisions provided as follows:

Section 203(r) defines:

" 'Enterprise' [as] the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose."

Section 203(s) defines: [4]

" 'Enterprise engaged in commerce or in the production of goods for commerce' [as] an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which . . . is an enterprise . . . whose annual gross volume of sales made or business done is not less than $250,000 . . . "

Section 203(b) defines:

" 'Commerce' [as] trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."

---

**1.** 29 United States Code, Sections 207 and 215(a)(2).

**2.** 29 United States Code, Sections 211(c) and 215(a)(5).

**3.** The time period in issue here is June 1, 1972 to January 1975. Certain provisions of the FLSA, specifically Section 203(s), were amended effective May 1, 1974, which amendments affect coverage of defendants' operations in this case. See note 5, p. 1336, *infra.*

**4.** Prior to the 1974 amendments to the Act. See note 3, p. 1335, *supra,* and note 5, p. 1336, *infra.*

Section 203(i) defines:

"'Goods' [as] goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

Section 203(j) defines:

"'Produced' [as] produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

The parties stipulated that for each of the years in question in this case, the defendants' operations had gross business done in excess of $250,000. Moreover, the defendants admitted in the pretrial stipulation, and the Court finds also from the evidence at trial, that at all times since June 1, 1972, the defendants have been through unified operation and common control, engaged in the performance of related activities for a common business purpose. Defendants' operations therefore constitute an "enterprise" within the meaning of Section 3(r) of the Act.

The initial question for determination by the Court therefore is whether the defendants' enterprise had employees engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s) of the Act for the various time periods involved. As this Court construes the effect of the statutory language, resolution of this question depends upon the time period under consideration.

## I. POST 1974 AMENDMENTS

The Secretary alleges continuing violations of the provisions of the Act by defendants for the entire period from June 1, 1972 through the filing of this action on January 27, 1975. Of critical importance to the determination of whether defendants' operation constituted an "enterprise engaged in commerce or in the production of goods for commerce" by virtue of employing persons who were engaged in commerce or the production of goods for commerce within the meaning of Section 3(s) of the Act, is the date of May 1, 1974—the effective date of the 1974 amendments [5] to the F.L.S.A.

As amended in 1974, Section 203(s) reads: [6]

"'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, *or* employees handling, selling, or otherwise working on goods *or materials* that have been moved in or produced for commerce by any person . . . ." (emphasis added)

The Secretary contends that as a result of the 1974 amendments, the activities of certain of defendants' employees in handling petroleum products, tires and mechanical parts used in fueling, lubricating and maintaining defendants' trucks and equipment, which, although purchased locally, previously moved in interstate commerce, are sufficient to give rise to the application of enterprise coverage to defendants' operations subsequent to the effective date of the amendments. Consequently, plaintiff contends that even if the materials are "consumed" by defendants in their business, subsequent to May 1, 1974, defendants are clearly subject to the overtime and record keeping provisions of the act and liable for violations thereof. *Dunlop v. Industrial America Corp.*, 516 F.2d 498, nn. 8, 9 (5th Cir. 1975); *Brennan v. Jaffey*, 380 F.Supp. 373, 377–79 (D.Del.1974).

---

5. Fair Labor Standards Act amendments of 1974, P.L. 93–259, Section 6(a)(5), 88 Stat. 59, 29 U.S.C. Section 203(s).

6. Prior to the amendment, Section 203(s) read as set forth in the text, p. 1335, *supra*.

The defendants attempt to rely on the "ultimate consumer" exception in the definition of "goods"[7] to remove them from coverage under the expanded definition of "enterprise engaged in commerce or production of goods for commerce" in Section 3(s), contending that all such materials used are for use solely by defendants and are not passed on to any customers. *Brennan v. Jaffey*, 380 F.Supp. 373 (D.Del.1974). This however, fails to take into consideration the specific addition of the words "or materials" in the broadened definition of enterprise contained in the amended Section 3(s).

The effect on employers of the modification of Section 3(s) was clearly defined by the district court in *Brennan v. Jaffey*, 380 F.Supp. 373 (D.Del.1974) wherein the court stated:

"In the absence of any enlightenment as to what Congress intended to accomplish in 1974 when it amended Section 203(s) to include 'materials', the amendment would be ambiguous at best. Nowhere in the Act are 'materials' defined in express terms. Section 203(i), however, defines 'goods' to include 'articles or subjects of commerce of any character'. This broad definition seemingly encompasses 'materials' and equates 'goods' and 'materials' as meaning the same thing. However, the Senate Report of the Fair Labor Standards Amendments of 1974, Sen. Rep. No. 93–690, 93d. Congress, 2d Sess., purports to explain why 'materials' was written into Section 203(s) in 1974 at p. 17:

'The bill also adds the words "or materials" after the word "goods" to make clear the Congressional intent to include within this additional basis of coverage the handling of goods consumed in the employer's business, as, *e. g.*, the soap used by a laundry. The "handling" language was added based on a retrospective view of the effect of substandard wage conditions.' . .

The 1974 Report . . . is of considerable significance in ascertaining what was intended when the amendment became effective May 1, 1974, by inserting the word 'materials' in Section 203(s). It clearly discloses a legislative purpose to make the minimum wage, overtime and record keeping provisions of the Act applicable to employers, such as the defendant, (whose employees handle goods used in the employer's own commercial operations) after its effective date. Its actual effect was therefore to expand its future coverage. . . ." 380 F.Supp. at 378.

It appears clear to the Court that, regardless of the conflict which has arisen among the courts on the question of enterprise coverage, prior to the 1974 amendments to the Act,[8] based solely upon the handling by employees of articles used in an employer's own business which have traveled interstate, there almost certainly can be no question as to the intended scope of Section 3(s) so as to include such employees after the passage of the said amendments.

This result was appropriately recognized by the District Court for the District of Delaware in *Brennan v. Jaffey, supra.* In direct contrast to a prior decision rendered by that same court only a year earlier, but decided prior to the 1974 amendments to the Act,[9] the Court held that an apartment complex owner who employed maintenance personnel who used supplies in the course of their duties in repairing and maintaining the apartments, but did not resell any products to the tenants, was covered under the expanded enterprise coverage concept contained in Section 3(s).

Very persuasive on this point as well is the Fifth Circuit's opinion in *Dunlop v. Industrial America Corporation*, 516 F.2d 498 (5th Cir. 1975). The Court there was faced with the question of whether a business which consumes gasoline and oil in the process of providing services to its customers is the "ultimate consumer" of those goods un-

---

7. See discussion of the ultimate consumer exception in text, pp. 1338–1340, *infra*.

8. See discussion p. 1339, *infra*.

9. *Brennan v. Apartment Communities Corp.*, 360 F.Supp. 1255 (D.Del.1973).

der Section 203(i), and therefore not subject to FLSA coverage. The defendant Industrial America Corporation operated a wholly intrastate garbage removal service, and its only tie to interstate commerce was that it had four employees who used gasoline and oil—products that had moved in interstate commerce—in operating and maintaining the company's trucks. The question arose in the context of a pre-1974 amendments situation, and the Court held that the defendant was not covered.

The Court did however express its view on the scope of the amended Section 3(s), stating that its effect would be to bring within coverage under the Act every enterprise in the nation doing business of $250,-000.00 a year:

"We think Congress did not intend by such indirect means and with no clear statement of legislative intent to expand coverage of the Fair Labor Standards Act [by the 1961 and 1966 amendments to the Act] *to every enterprise in the nation doing business of $250,000 a year, which would be the practical result of the approach the Secretary here contends for.* Congress recently said it thought that was the effect of its prior amendments, and *amended the act to achieve that result* [1974 amendment]. But that amendment is prospective only and Congress' failure to make clear its intentions in 1961 and 1966, if such they were, do not enable us to achieve what Congress itself *did not do until 1974.*" (emphasis added) (footnote omitted). 516 F.2d at 501–02.

Impliedly therefore, the Fifth Circuit indicated that its interpretation of the effect of the amended Section 3(s) would extend coverage of the Act to employers such as the defendants herein, who conduct a wholly intrastate business, but whose employees, in the course of that business, use and handle any products, including gasoline, oil, and tires in operating and maintaining equipment and trucks, which products have moved in interstate commerce, even though the products are purchased locally. The Court recognizes that the statement concerning the future scope of Section 3(s) of the Act in *Industrial America Corporation* is dicta only; however, this Court is per-

suaded that the Fifth Circuit has correctly expressed the intent of Congress in enacting the 1974 amendments.

■ The Court therefore finds that, as to the period subsequent to the effective date of the 1974 amendments to the F.L.S.A., to-wit: May 1, 1974, the defendants' operations constitute an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s) of the Act. The defendants are therefore subject to the overtime and record keeping provisions of the Act as to each and every employee for that time period.

## II. PRE–1974 AMENDMENTS

### A. Enterprise Coverage:

For the relevant period at issue prior to the May 1, 1974 effective date of the 1974 amendments, the plaintiff contends that the defendants are likewise subject to enterprise coverage under the Act based on the handling by defendants' employees of goods and supplies which originated out-of-state and which were allegedly processed or passed on to defendants' customers in some form as ingredients or parts of their work produced.

The Secretary contends that the work of certain of the defendants' employees makes them "employees handling, selling or otherwise working on goods that have been moved in commerce" under Section 3(s) and thus makes defendants subject to the Act. This contention primarily is based on these employees' handling of products which were produced outside the state and used in the performance of their respective duties.

The evidence adduced at trial is that the defendants' employees regularly used petroleum products in fueling and lubricating vehicles used in defendants' business, and regularly purchased tires and other mechanical parts for use on the various trucks and other machinery owned by defendants and used in their business. All such items were purchased locally, either in Tampa or Ft. Myers, or other locations in Lee County, but had been produced out of state and delivered to those retailers in this state for resale.

Although it is uncontested that the defendants' employees "handled or worked on" such items which had previously moved in commerce, the question arises whether such items are "goods" [10] within the meaning of the Act.

The language of Section 203(i) defining "goods" for purposes of Section 203(s) carves out an exception from coverage under the Act for the "ultimate consumers" of products. Defendants contend that during the relevant period, they were the ultimate consumers of all such goods after delivery and are therefore excepted from enterprise coverage under the Act.

The question of enterprise coverage and the scope of the ultimate consumer exception in Section 3(i) as applied to employers whose employees "consume" products produced outside the state in the course of performing services for others (customers of the employer) has produced much litigation and several divergent views among the courts which have confronted this particular question. *Compare, Shultz v. Wilson Building*, 320 F.Supp. 664 (S.D.Tex.1970), aff'd on other grounds sub nom. *Brennan v. Wilson Building, Inc.*, 478 F.2d 1090 (5th Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 156, 38 L.Ed.2d 105 (1973); *Shultz v. Travis-Edwards, Inc.*, 320 F.Supp. 834 (W.D.La.1970), rev'd on other grounds sub nom. *Hodgson v. Travis-Edwards, Inc.*, 465 F.2d 1050 (5th Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972); *Brennan v. Apartment Communities Corporation*, 360 F.Supp. 1255 (D.Del.1973); *cf., Brennan v. Jaffey*, 380 F.Supp. 373 (D.Del.1974); *Shultz v. Arnhiem and Neely, Inc.*, 324 F.Supp. 987 (W.D.Pa.1969) *with, Brennan v. Dillion*, 483 F.2d 1334 (10th Cir. 1974); *Brennan v. State of Iowa*, 494 F.2d 100 (8th Cir. 1974), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2422, 44 L.Ed.2d 683 (1975); *Hodgson v. Rivermont Corp. d/b/a Fox Meadows Apartments*, 71 CCH Lab.Cas.Para. 32,898 (M.D.Fla.); *Hodgson v. David M. Woolin & Son*, 20 WH Cases 91, 64 CCH Lab.Cas. Para. 32,527 (S.D.Fla.); *Sharp v. Warner Holding Co.*, 70 CCH Lab.Cas.Para. 32,821 (D.C.Minn.1972); *Mansdorf v. Ernest Tew Associates*, 69 CCH Lab.Cas.Para. 32,775 (M.D.Fla.1972); *Hodgson v. Howard d/b/a Howard Cleaners*, 69 CCH Lab.Cas.Para. 32,777 (N.D.Ala.1972); *Wirtz v. Washeterias, S.A.*, 304 F.Supp. 624, 59 CCH Lab.Cas. Para. 32,116 (D.Canal Zone 1968); *Hodgson v. Keller d/b/a Plaza Laundromat & Dry Cleaning*, 20 WH Cases 1073, 70 CCH Lab. Cas.Para. 32,848 (D.Ohio 1973); *Shultz v. Union Trust Bank of St. Petersburg*, 297 F.Supp. 1274 (M.D.Fla.1969).

Although two circuit courts of appeals have accepted the view advanced by the plaintiff that businesses are not the ultimate consumers of goods they consume in providing services to their customers, *see Brennan v. State of Iowa*, 494 F.2d 100 (8th Cir. 1974), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2422, 44 L.Ed.2d 683 (1975); *Brennan v. Dillion*, 483 F.2d 1334 (10th Cir. 1974), insofar as this Court is concerned, this question has been conclusively determined by the Fifth Circuit adversely to the Secretary in the recent case of *Dunlop v. Industrial America Corp., supra*, 516 F.2d 498.

In that decision, the Court was faced with the question of whether a local business which consumed gasoline and oil in the process of providing services to its customers was the "ultimate consumer" of those goods for purposes of Section 203(i). The Court fully analyzed the Act and the 1961 and 1966 amendments thereto, which first developed the enterprise coverage concept, in an attempt to determine the intent of Congress concerning the language used in the Section 203(i) definition of "goods" and the Section 203(s) definition of "enterprise engaged in commerce or in the production of goods for commerce".

The Fifth Circuit reasoned that the word consumer in Section 203(i) was not being used in its popular sense of a private, domestic (as opposed to business or commercial) user of goods, but rather found that it could also apply to business enterprises. The Court then determined that Congress had failed to specifically express an intention to extend the coverage of the act to circumstances such as were presented in that case, and therefore held that

---

**10.** See statutory definition at pp. 1335 and 1336, *supra*.

"prior to its amendment in 1974 the Fair Labor Standards Act did not reach enterprises which provided only services to its customers and did not pass on any goods obtained from interstate commerce." (footnote omitted) 516 F.2d at 502.

This Court is of the opinion that the decision of the Fifth Circuit in *Industrial America Corp., supra,* that gasoline and petroleum used by an employer in the course of his business is controlling on the question of enterprise coverage under the act prior to the 1974 amendments [11] under consideration in this case.

The Secretary however, urges another line of authority as support for his view that the defendants' employees are covered under the language of Section 3(s). This line of cases, support for which has also been recognized by the Fifth Circuit in *Dunlop v. Industrial America Corporation, supra,* 516 F.2d at 502, n. 9 (5th Cir. 1975),[12] appears to hold that employers would be covered under the Act where they obtain products from out of state which are in some manner integrated into the work performed for customers, or in a product sold to a customer. In a sense, such an employer is a "processor" of the products received from interstate commerce and he passes it on to his customer in the same fashion, and therefore is not the "ultimate consumer thereof."

Application of such a rationale to employers whose employees use products merely in performing services for customers, e. g., the gas and oil for the trucks used in a local garbage removal service, was rejected by the Fifth Circuit in *Industrial America Corporation, supra.* However, as applied to certain other employers, such a rationale is entirely consistent with the terms of the act and the interpretation thereof by the Fifth Circuit in *Industrial America Corporation.* The prime example of such a situation is the construction industry, where employers purchase basic ingredients from interstate commerce which are assimilated into the final project built for a customer.

The leading case employing this approach is *Wirtz v. Melos Construction Corporation,* 408 F.2d 626 (2nd Cir. 1969), wherein the Second Circuit held that a construction company's employees who handled ready-mix cement of interstate origin which was converted into concrete and used by the employees in building foundations for homes were covered under the enterprise coverage of the act, and were not excluded under the "ultimate consumer" exception to the definition of "goods".

This Court however is of the opinion that, even recognizing this latter reasoning as an acceptable rationale and interpretation of the act prior to the 1974 amendments, it is in no way applicable to the defendants herein. Even assuming the defendants are engaged in the construction industry, this fact alone is not sufficient to render inapplicable the "ultimate consumer" exception of Section 3(i) as to certain articles received in interstate commerce which are consumed by defendants in their business.

Of critical importance in this regard is the nature of the materials used. The cases relied on by the Secretary involve products such as cement,[13] or other construction materials [14] used in erecting buildings or some

---

11. The 1974 amendment leaves the definition of goods intact but circumvents it by a broader definition of "enterprise engaged in commerce." The new definition includes enterprises with "employees handling, selling, or otherwise working on goods *or materials* that have been moved in . . . commerce . . ." (emphasis added) See, S.Rept. 93–690, 93d Cong., 2d Sess., p. 17 (1974). 516 F.2d at 502. See also discussion p. 1336, *supra.*

12. In stating that the FLSA did not reach enterprises which provided only services to its customers and did not pass on any goods obtained from interstate commerce the Court noted that the result might be different for other employers:

"Compare, e. g., the construction and cleaning industries, referred to in the statute, Sections 203(s)(2) and (3), both of which pass on some physical product, e. g., building materials, and hangers and protective covers, respectively." 516 F.2d at 502, n. 9.

13. *Wirtz v. Melos Construction Corp.,* 408 F.2d 626 (2nd Cir. 1969).

14. *Wirtz v. Mayer Construction Co.,* 291 F.Supp. 514 (D.N.J.1968).

other final construction project for a customer. The evidence in this case however is that defendants did not receive any such materials from interstate commerce.

The defendants herein are primarily engaged in providing fill dirt and performing clearing and grading services preparatory to initial construction. All the fill was obtained from local borrow pits and the defendants received nothing from interstate commerce which would be in the nature of materials "processed" by the defendants' employees and passed on in their work.

■ The only items so purchased by the defendants were the gas and other petroleum products, tires and mechanical parts used in operating and maintaining defendants' trucks and other machines. On the basis of the Fifth Circuit's decision in *Industrial America Corporation*, the Court finds that the use of such products by the defendants' employees in the course of its business makes the defendants the "ultimate consumers" of such goods within the meaning of Section 3(i) and renders them excepted from coverage under Section 3(s) on this ground.

B. Individual Coverage:

■ A finding that the defendants' operations do not satisfy the criteria for enterprise coverage under the Act for the entire period under consideration does not end the inquiry as to the defendants' liability for overtime pay due their employees. In the absence of coverage for all employees under the "enterprise" concept, the Court must still make a determination as to whether any of defendants' employees are covered by the Act on the traditional basis of engagement by individual employees "in commerce or in the production of goods for commerce". *Shultz v. Poirier*, 300 F.Supp. 1156 (E.D.La.1969).

■■ The standard for determination of coverage of an employee for a particular period is based on the workweek. If in any workweek an employee is engaged in both covered and noncovered work he is entitled to the benefits of the act for the entire week regardless of the amount of covered activities that are involved, so long as the covered activities are not merely isolated, sporadic or occasional. *Wirtz v. Durham Sandwich Co.*, 367 F.2d 810 (4th Cir. 1966); *Wessling v. Carroll Gas Co.*, 266 F.Supp. 795 (D.Iowa 1967). Thus, an employee may be covered in one workweek and not the next, depending upon his activities. The Court therefore is faced with the task of reviewing the activities of defendants' employees for the relevant period to determine for which periods they performed activities sufficiently related to commerce to entitle them to the protection of the act.

The difficulty in such a task was aptly described by Mr. Justice Frankfurter's exhortation in *A. B. Kirschbaum Co. v. Walling*, 316 U.S. 517, 520, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638 (1942), that the:

> "search for a dependable touchstone by which to determine whether employees are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle."

As noted by the Fifth Circuit in *Brennan v. Wilson Building, Inc.*, 478 F.2d 1090, 1094 (5th Cir. 1973), the Supreme Court in *Kirschbaum* :

> "recognized that application of the FLSA to an infinite number of industrial and commercial situations is essentially a line-drawing exercise, and that in delineating between areas of activities regulated by the Act and those left to state regulation, courts should be guided by the fixed points of national policy, legislative history, and administrative practicalities." 316 U.S. at 523, 62 S.Ct. 1116.

The task facing the Court is to determine whether the activities of the defendants' employees on certain projects undertaken by the defendants during the time period from June 1972–May 1, 1974 are sufficiently related to commerce to justify the extension of the act's benefits to these employees. At the outset, it must be noted that the defendants' activities constitute basically a purely intrastate, local operation, involving the hauling of fill dirt and provid-

ing grading and leveling services to general contractors and independent owners and developers for their use on various projects, the nature of which the defendants are often unaware.

■ The inherently local nature of defendants' basic operations however, is not conclusive for the purpose of determining individual workweek coverage. As has been consistently held, practical considerations, and not technical conceptions must guide the court in determining coverage under the Act, and the crucial test is the nature of the activities of the employee, rather than the general character of the employer's business. *Mitchell v. Lublin McGaughey & Associates*, 358 U.S. 207, 209, 79 S.Ct. 260, 262–263, 3 L.Ed.2d 243, 246 (1959); *Brennan v. Wilson Building Inc.*, 478 F.2d 1090, 1094 (5th Cir. 1973); *Wirtz v. Wohl Shoe Co.*, 382 F.2d 848, 850 (5th Cir. 1967).

## I.

At trial the Secretary introduced evidence pertaining to a number of projects undertaken by the defendants during the period from June 1, 1972—May 1, 1974, in which employees performed services allegedly sufficiently related to commerce to be within the penumbra of the Act. These projects included:

*Skyline Drive*—The defendants hauled and dumped fill dirt used for filling in low areas and in preparation for a road bed at a construction site for Pulte Construction Company, a general contractor engaged in building a parkway connecting U. S. Highway 41, a major thoroughfare for travelers and carriers from Tampa, Florida to points along the western Florida coast, and Moody Road. When completed, upon joinder of the two portions of the road built by Pulte with a bridge constructed by Lee County, and with the rest of Skyline Drive, the Skyline Drive, renamed Hancock Bridge Parkway, would connect U. S. 41 and State Road 78.

Defendants' employees merely hauled in fill dirt and dumped it, and Pulte's employees spread and graded it as desired. The portion of the road upon which defendants' fill dirt was placed was not connected to the parkway until some time after defendants' work had been completed when the county completed the construction of the connecting bridge. The roadway was not dedicated to the county until much later also.

*Fort Myers News Press*—Pulte Construction was engaged in the expansion of existing facilities of the Ft. Myers News Press, including a new building, parking lot and loading area. The defendants' employees hauled away debris after Pulte had cleared the land, and delivered fill to raise the land for the new facilities. The fill was spread and graded by Pulte.

*Southside Industrial Park*—Pulte Construction was engaged in preparing vacant land for the construction of new plant facilities for several companies in a new industrial park. When completed, the park included a telephone company, United Parcel Service, and other firms engaged in commerce or in the production of goods for commerce. Pulte cleared the land, put in a parking lot, sewage system, and erected the buildings.

Defendants' employees hauled in fill and lime-rock for use by Pulte in the various construction activities. At the time defendants performed their services, only the United Telephone Company office was constructed.

*Huttig Sash & Door*—Castle Construction Company was engaged in erecting a new building on a vacant site for the Huttig Sash and Door Company in the Southside Industrial Park. The Huttig Sash and Door Company is a distributor to local lumber dealers of millwork which comes to it from interstate commerce.

Defendants sub-contracted with Castle to prepare the site for construction, including clearing the land, hauling fill and base rock for parking lot and loading area, and paving certain roads, the latter work in turn being sub-contracted to Harper Brothers, Inc. At the time defendants' employees worked on the site, the Huttig Sash & Door Plant had not yet been erected there.

*Glades Lumber & Industrial Park Complex*—This was work done in another industrial park area for several different concerns, including Glades Lumber Company which owns a warehouse in the complex and which distributes lumber received in interstate commerce from Georgia, Nevans & Simmons, owners of Glades Lumber Company, and Bob Dean Steel Buildings. The defendants' employees cleared land, brought in and spread fill dirt and base rock for buildings and private roadways which were constructed some time after defendants had completed their work. Defendants also contracted to do paving, which work they subbed out to Harper Brothers, Inc.

A large number of businesses have offices or plants in the complex now and many are engaged in commerce or in the production of goods for commerce. Included are: Horn-Wilson, Inc., a wholesale distributor of plumbing supplies, 70–75% of which are received from interstate commerce; and Edison Moving and Storage, which transports goods in interstate commerce. There are also rail sidings in the park now.

*South Commercial Park*—Another industrial park project, the defendants' employees hauled in dirt and rock, cleared the area, graded areas for roads and drainage (the roads were built at a time after defendants did their work), and sub-contracted paving work to Harper Brothers. At the time of defendants' work, the site was vacant and no structures had as yet been built.

The park now includes several businesses which are engaged in commerce or the production of goods for commerce, such as General Medical Corporation, a national corporation which sells medical supplies received from interstate commerce, and Seablue Corporation, a national firm which distributes swimming pool supplies received from interstate commerce.

*Romac Steel*—The defendants' employees cleared the area, graded fill and base rock for a parking lot and loading area for the employees of the Romac Steel Plant, and a private road leading to the plant.

These activities were a part of the expansion of the Romac Steel Plant. Harper Brothers was contracted by defendants to do the paving.

Romac Steel has been in business for some time. It fabricates steel framework for schools and commercial buildings. It receives much of its steel from interstate commerce and then ships out approximately 90% of its finished products in interstate commerce.

*Woodsmoke Camping Resort*—Woodsmoke is a campground and overnite travel-trailer park located on U. S. Highway 41, servicing large numbers of out-of-state visitors. Over 75% of its business is derived from travelers from outside the State of Florida.

The defendants' employees hauled fill dirt and base rock and graded some roads on a vacant site adjacent to the area where the old campground was located, to which the campground was later expanded after defendants' work had been completed.

*American Outdoor Campground*—Also a campground and travel-trailer park serving primarily travelers from outside the State of Florida. Defendants' employees hauled fill dirt to a vacant site known formerly as Travel Town Trailer Park, which is currently the location of American Outdoor Campground. Defendants sub-contracted to Quality Paving the work of spreading the fill and doing the paving of roadways.

*Fort-Myers Coca-Cola Bottling Company*—The defendants' employees cleared land, hauled and graded fill and base rock for the expansion of the Fort Myers Coca-Cola plant to a new parking lot and loading area. The area worked on was adjacent to the plant, but outside the fence surrounding the facility.

Fort Myers Coca-Cola receives some of the goods which it distributes from interstate commerce, and is engaged in the production of goods for commerce.

*Allied Van Lines*—Defendants' employees hauled base rock and spread and compacted it on an area outside the fenced-in location of the Allied Van Lines facility.

The company later expanded to this area for parking facilities. The work involved only James Whitehead and one other employee, and lasted only about 4 hours on one day. Allied Van Lines transports goods in interstate commerce and is engaged in interstate commerce.

*Industrial and Marine Hardware*—Defendants' employees cleared land, hauled in some fill and base rock for a building site and parking lot and loading area, Industrial and Marine Hardware, which at the time was an existing company at a different location.

Industrial and Marine Hardware sells hardware to other dealers and receives approximately 40% of its goods from interstate commerce.

*Forest Park*—Forest Park, also known as Vista Village, is a mobile home park and subdivision containing 430 mobile home lots. There are no travel-trailers in the park, and the residents are all permanent residents as opposed to over-night or temporary visitors. Defendants' employees cleared land and cut and graded roads for the subdivision, and hauled fill and lime-rock for home sites and roadways. Harper Brothers did the paving of driveways and streets. The streets are all private, and maintained by the subdivision.

*Twin Lakes Estates (Family Estates)* —Another mobile home park, likewise with permanent residents and no overnight rentals or space for travel-trailers. The park contains some 624 lots. There are some out of state owners, and the residents receive mail by home delivery.

Defendants' employees cleared land, hauled and graded fill dirt and rock, and graded land for roads, which were paved by Harper Brothers.

## II.

The overtime provisions of the Fair Labor Standards Act apply to employees "engaged in commerce or in the production of goods for commerce." [15]

As can be seen from the terms of the Act,[16] three categories of employees are brought within the scope of the Act. Employment "in" commerce, employment "in" production of goods "for" commerce, and employment in an activity which is "related" to production for commerce are all included. *Mitchell v. H. B. Zachry Co.,* 362 U.S. 310, 315, 80 S.Ct. 739, 743, 4 L.Ed.2d 753, 759 (1960). Moreover, insofar as construction work specifically is concerned, the courts have cast the relevant tests for determining the scope of "in commerce" coverage in substantially similar language to that provided in the statute for determining the reaches of coverage under the "production" phase.[17] As a result, the act has been held to extend to construction work which is *so intimately related to the functioning of interstate commerce or its instrumentalities as to be, in practical effect, a part of it,* as well as to construction work which has a close and immediate tie with the process of production. *Mitchell v. C. W. Vollmer & Co.,* 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955)

However, no precise formulation exists for determining whether any employee is engaged in commerce or its related activities, and the court must therefore be guided by the general principles established by the numerous cases which have struggled with this same issue in exercising its "line-draw-

---

**15.** "Maximum hours

(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than 40 hours, unless such employee receives compensation *for his employment in excess of* the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed . . . ." 29 U.S.C. Section 207.

**16.** See text p. 1335, *supra* for definitions of "commerce" and "produced" contained in Section 203.

**17.** ". . . for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed . . . in any closely related process or occupation directly essential to the production (of goods) . . . ." 29 U.S.C. Section 203(j).

ing" function. The Supreme Court has established that both phases of coverage under the terms of the act should be given a "liberal construction" determined by "practical considerations", not "a strained, technical one", in order to effectuate the Act's purposes. *Mitchell v. C. W. Vollmer & Co., supra.*

Appropriately therefore, the Supreme Court has rejected any technical application of a "new construction" exception for determining covered activities in the construction industry, relying instead on the basic test established for determining the relationship of all activities to commerce and analyzing the work performed on that basis. *Mitchell v. H. B. Zachry Co., supra. Mitchell v. C. W. Vollmer & Co., supra.*

In determining whether the defendants' employees are covered under the act for services performed on any project during the relevant period in this case, the Court must examine the activities under the tests established for determining coverage under both the "in commerce" and "production" phases of coverage. Although the activities of the employees were essentially similar on each project, depending on the nature of the project and the entity or facility for which or upon which the work was performed, the defendants' employees may at alternate times have been engaged either in commerce, or in the production of goods for commerce.

■ *Engaged in Commerce*—For one to be engaged in "commerce" the employee must be in commerce itself. *Wirtz v. B. B. Saxon Co.,* 365 F.2d 457 (5th Cir. 1966). However, the Supreme Court has held that the application of the statute extends "throughout the farthest reaches of the channels of interstate commerce", *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 567–68, 63 S.Ct. 332, 335, 87 L.Ed. 460 (1943), and has developed a test which extends coverage under the act for construction work which is not only physically in or on a facility or instrumentality of interstate commerce but also work which is "so directly and vitally related to the functioning of an instrumentality or facility of interstate

commerce as to be, in practical effect, a part of it, rather than isolated local activity." *Mitchell v. C. W. Vollmer & Co., supra.*

■ *Production of goods for commerce* —The test for coverage under the "production" aspect of the statute extends the benefits of the act to employment in "any closely related process or occupation directly essential" to the production of goods for commerce. 29 U.S.C. Section 203(j).

However, the Supreme Court noted that there are limits to the extension of coverage of the act so as to effect the Congressional intent not to unduly displace state regulation of certain local activities. *Mitchell v. H. B. Zachry Co., supra.*

In defining the parameters of coverage under the "production" concept, the Supreme Court stated in *Mitchell v. H. B. Zachry Co.,* 362 U.S. 310, 315, 80 S.Ct. 739, 743, 4 L.Ed.2d 753, 759:

"In *A. B. Kirschbaum Co. v. Walling,* we found that limits on coverage cannot be understood merely in terms of the social purposes of the Act, in light of which any limitations must appear inconsistent. For the Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character. Accommodation of these interests was sought by the device of confinement of coverage to employment in activities of traditionally national concern. The focus of coverage became 'commerce', not in the broadest constitutional sense, but in the limited sense of Section 3(b) of the statute: 'trade, commerce, transportation, transmission, or communication among the several States. . . . ' Employment 'in' such activities is least affected by local interests. A step removed from employment 'in commerce' is employment 'in' production which is 'for' commerce. . . . Furthest removed from 'commerce' is employment not 'in' production 'for' commerce but in an activity which is only 'related' to such production. In applying this provision, we have

necessarily borne in mind that it is furthest removed in the scheme of the statute from the hub of the national interest in 'commerce' upon which a limited displacement of state power is predicated." (citations omitted)

However, it is the activity of the employees rather than the employer's business which is the important consideration and it is immaterial if the defendants' participation on many of the projects considered was only as an independent contractor performing construction work for or on behalf of another firm which is engaged in interstate commerce or in the production of goods for commerce. *Mitchell v. Lublin, McGaughey & Associates,* 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959).

The primary focus of the coverage determination in the construction industry is by the "project" under construction and if the project is a "covered" one, then generally all the employees who participate in the continuing effort to produce the desired result are covered as well.

To be covered however, the project must be related to commerce or the production of goods for commerce. That is, the construction work must be physically or functionally integrated or closely identified with an existing covered instrumentality or production facility. Neither the mere fact that the work involves "new construction", nor the fact that it is physically separated from an existing covered plant is sufficient to exclude coverage. Such factors may be persuasive in determining whether, as a practical matter, the work is directly and vitally related to the functioning of the covered instrumentality or facility, but they are not decisive. *See, Mitchell v. C. W. Vollmer & Co., supra; Archer v. Brown & Root, Inc.,* 241 F.2d 663 (5th Cir. 1957).

With these principles in mind to guide its coverage determinations, the Court now turns to an examination of the activities of defendants' employees on the enumerated projects, and to the narrow inquiry of whether these activities engaged the employees in commerce or in the production of goods for commerce.

III.

In certain instances, the defendants' employees were engaged in activities relating to the preliminary construction of roads and streets. The Secretary contends that defendants' employees are covered as being engaged in commerce and in the production of goods for commerce in any weeks in which the employees performed work in building or maintaining roads or hauling materials used in building or maintaining instrumentalities of interstate commerce. One such project was the Skyline Drive project.

On strikingly similar facts, the Fourth Circuit Court of Appeals, in the case of *Mitchell v. Emala & Associates, Inc.,* 274 F.2d 781 (4th Cir. 1960), held that an employee who hauled fill dirt from his employer's local borrow pit to fill sites for the construction of roads which were improvements to the interstate highway system in Baltimore County, Maryland, and who operated a bulldozer to level the loads of dirt so hauled, was engaged in commerce and in the production of goods for commerce within the meaning of the FLSA.

The Fourth Circuit concluded that the employee was engaged in commerce after a comprehensive examination of the applicable cases:

"The leading case dealing with employees working directly upon an instrumentality of commerce is *Overstreet v. North Shore Corp.,* 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656, where the employer operated a toll road and drawbridge, integral parts of the interstate highway system. One of two employees there suing for minimum wages and overtime was engaged in repair work on the road and the drawbridge, while the other sold toll tickets. In holding that both were 'engaged in commerce', and therefore within the protection of the Act, the Supreme Court said, 318 U.S. at pages 129–130, 63 S.Ct. at page 497:

‘ * * * Vehicular roads and bridges are as indispensable to the interstate

movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail. If they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce * * *

Those persons who are engaged in maintaining and repairing such facilities should be considered as "engaged in commerce" * * * because without their services these instrumentalities would not be open to the passage of goods and persons across state lines. * * *'

There, the Supreme Court flatly held that persons engaged in maintaining and repairing roads and bridges are engaged in commerce.

In *Mitchell v. C. W. Vollmer & Co.,* 1955, 349 U.S. 427, 429–430, 75 S.Ct. 860, 862, 99 L.Ed. 1196, where the Court held that employees working on the construction of an earthwork embankment and concrete platform for a canal lock were engaged in commerce, the following test was set forth:

' * * * The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity * * * Repair of facilities of interstate commerce is activity "in commerce" within the meaning of the Act as we held in *Fitzgerald Construction Co. v. Pedersen,* 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316. And we think the work of improving existing facilities of interstate commerce, involved in the present case, falls in the same category.'

This test was later applied in *Mitchell v. Lublin, McGaughy & Assoc.,* 1959, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243, where it was held that draftsmen, fieldmen, clerks and stenographers, working for an employer who designed and planned construction projects, such as widening of streets, relocation of radio and television facilities, paving of airplane taxiways and parking aprons, and

sewerage systems, were engaged in commerce. Most of these employees did not even go to the site of the proposed construction.

Certainly, (this employee's) work meets the test prescribed by the Supreme Court. Hauling fill dirt to a road site, and leveling it there, is 'so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it. * * *' "

Similarly, this Court is of the opinion that the hauling of fill dirt to the road site in the instant case and dumping it there is likewise "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it. . . . " *Mitchell v. C. W. Vollmer, & Co., supra.*

In view of the results reached by the courts which have faced coverage questions concerning similar construction projects of city streets, this Court is convinced that the work being done by Pulte Construction on the Skyline Drive, and the nature of the Skyline Drive (now the Hancock Bridge Parkway), are such as to constitute the project a "covered" one. The construction of a city street, even in a residential area, which directly connects with any interstate highway is so closely related to the interstate commerce moving on the existing highway as to be part of it. *Goldberg v. P & L Equipment Company,* 311 F.2d 88 (5th Cir. 1963); *Archer v. Brown & Root, Inc.,* 241 F.2d 663 (5th Cir. 1957); *Mitchell v. Brown,* 224 F.2d 359 (8th Cir.).

As noted above, when completed, the project would make Skyline Drive (Hancock Bridge Parkway) a link between U.S. 41, the only major U. S. highway along Florida's west coast, and S.R. 78, a heavily trafficked portion of the State highway system. The testimony at trial was that after completion of the entire project, the road was used for transportation of United States postal matter and goods which had traveled in interstate commerce.

Further, it can be clearly seen from the location of the road as depicted on the map of the Ft. Myers area introduced as plaintiff's Exhibit No. 1, that the road inevitably would serve as an instrumentality for the carriage of goods and persons which have moved in interstate commerce. This is sufficient activity to render this roadway an instrumentality of interstate commerce for the purposes of the FLSA. *Goldberg v. P & L Equipment Company*, 311 F.2d 88 (5th Cir. 1962) (Over dissent, city street in Houston while not yet designated as part of the highway system of the United States or Texas but which led into a U. S. Highway held to be an instrumentality of interstate commerce); *Austford v. Goldberg*, 292 F.2d 234 (8th Cir. 1961) (dirt and gravel county and township roads which were used for the movement of persons and commodities passing between various states are instrumentalities of interstate commerce); *Archer v. Brown & Root, Inc.*, 241 F.2d 663 (5th Cir. 1957) (Lake Ponchartrain Causeway which was to be a link with the interstate highway system in and around New Orleans is an instrumentality of interstate commerce); *Mitchell v. Raines*, 238 F.2d 186 (5th Cir. 1956) (Roads regularly used to carry postal matter and for transportation of goods to other states are instrumentalities of interstate commerce); *Emulsified Asphalt Products Co. v. Mitchell*, 222 F.2d 913 (6th Cir. 1955) (City streets primarily serving intrastate purposes but which carry persons and goods passing between states are instrumentalities of interstate commerce).

The fact that part of the purpose of constructing this roadway may have been to aid purely intrastate traffic and the local residents of the towns of North Ft. Myers and Cape Coral in getting to and from downtown Ft. Myers, by providing a more convenient access to the bridge across the Caloosahatchee River, does not alter the result that the road would be an integral part of the State and U. S. Highway system and vastly improve the means of transporting goods and travelers moving in interstate commerce. Coverage for work performed in the construction of such a roadway is therefore appropriate. *Archer v.*

*Brown & Root, Inc., supra. Mitchell v. Brown, supra; Emulsified Asphalt Products v. Mitchell, supra.*

Moreover, the fact that the work performed on the small section of the roadway constructed by Pulte might constitute "new construction" does not alter the Court's finding that defendants' employees were engaged in the construction of an instrumentality of interstate commerce.

Although a number of courts have previously held that the construction of new highways is not within the scope of the Act, these decisions relied upon a technical "new construction" concept which the United States Supreme Court has subsequently rejected as a basis for determining coverage under the Act. *Compare Mitchell v. C. W. Vollmer & Co.*, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; *Mitchell v. Zachry, supra; with Van Klaaveren v. Killian-House*, 210 F.2d 510 (5th Cir. 1954); *Moss v. Gillioz Construction Co.*, 206 F.2d 819 (10th Cir. 1953).

Where employees engage in the construction of new facilities or instrumentalities of interstate commerce, rather than on the repair or maintenance of existing facilities, this is only an additional factor which must be weighed under the *Vollmer* test in determining the relation of the employees' work to commerce. *See Mitchell v. H. B. Zachry Co., supra*, 362 U.S. 310, 319–320, 80 S.Ct. 739, 4 L.Ed.2d 753; *Archer v. Brown & Root, Inc., supra*, 241 F.2d 663, 667.

Under the principles now established by the Supreme Court's decisions, the construction of new highways and streets which will connect with an interstate highway system is "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it." *Mitchell v. C. W. Vollmer & Co., supra.*

The Fifth Circuit in the case of *Archer v. Brown & Root, Inc.*, 241 F.2d 663, 667 (5th Cir. 1957), recognized this trend in the Supreme Court decisions and set forth the analysis applicable to the new construction

of a project physically isolated from established facilities of interstate commerce but of which the facility under construction will ultimately be a part:

> " . . . in the emphasis to be given 'practical considerations' if it is plain that the project, when completed, is intended to and will serve as an important definite addition to, or improvement of, existing identifiable instrumentalities and thus facilitate the flow of commerce, whether by savings in time, or distance, elimination of costly delays or obstacles, or by an infinite variety of other causes, then mere physical isolation, separation of the project from the point or points of its ultimate connection with existing facilities or the necessity for a *future* connection will not be decisive." 241 F.2d at 667. (emphasis added)

Applying the test to the roadway under construction in this case, the Court is of the opinion that it is clearly an improvement of an existing instrumentality of interstate commerce, U.S. 41, which will facilitate the flow of commerce. The construction of this roadway is therefore covered under the Act.

Having determined that the Skyline Drive project is a covered one, the Court is of the opinion that no great straining of the principles governing coverage of construction employees under the Act is necessary to find that the defendants' employees engaged in performing services for this project are covered. The work performed by the defendants' employees constituted the first vital step in the construction of the roadway and as such, even though only a minimal task, is directly related to the ultimate construction of the road.

■ Once the design of such a construction project has been established and the project proceeds to the moving of the first bit of earth preparatory to the final paving, the construction of the roadway is a continuous process, and those engaged in it, whether as employees of one company or contractor or of several independent construction firms, are all within the contemplation of the congressional intent as to coverage under the Act. *See, Mitchell v.*

*Lublin, McGaughy & Associates,* 358 U.S. 202, 79 S.Ct. 260, 3 L.Ed.2d 243 (1973); *Mitchell v. Brown,* 224 F.2d 359 (8th Cir. 1955); cf., *Mitchell v. Hooper Equipment Co.,* 279 F.2d 893 (5th Cir. 1960).

■ The Court therefore finds that the defendants' employees engaged in hauling and dumping fill dirt at the site of the Skyline Drive project performed services sufficient "directly and vitally related to the functioning of an instrumentality or facility of interstate commerce" to bring them within the coverage of the Act.

It may be argued that this case is distinguishable from the facts in *Mitchell v. Emala & Associates, Inc., supra,* in that here the defendants' employees performed no construction work at the site—they merely hauled and dumped the dirt where instructed—whereas the employee in the *Emala* case actually did some leveling of the fill with bulldozer equipment at the site. Although the Court thinks it clear that the work performed by the defendants' employees is sufficiently related to commerce to extend coverage to the employees under the "in commerce" standard, even assuming, arguendo, that this finding is in error, the defendants' employees on this project would still be covered under the Act as being "engaged in the production of goods for commerce". *See, Mitchell v. Emala & Associates, Inc., supra,* at 784–785.

On this point as well, the Court agrees with the decision reached by the Eighth Circuit in *Emala & Associates, Inc., supra,* and quotes a portion of that opinion examining the case law on this point as being dispositive of this issue:

> " . . . we are of the opinion that when (the employee) hauled fill dirt from the borrow pit to the beltway construction site, he was engaged in the production of such goods for commerce. In *Alstate Construction Co. v. Durkin,* 1953, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745, an employee working in the production of amesite, a bituminous concrete road surfacing mixture, was held to be engaged in the production of goods for commerce;

and in *Thomas v. Hempt Bros.*, 1953, 345 U.S. 19, 73 S.Ct. 568, 97 L.Ed. 751, an employee who quarried stone and used it to make cement, which his employer hauled to interstate roads, was likewise considered so engaged. Like amesite and cement, which constitute the surface, fill dirt, which becomes the sub-surface, is widely used in road building. We fail to discover any differences warranting a legal distinction whereby, while the former products fall into the classification of 'goods for commerce', the latter product does not.

The employer insists that earth is significantly different from other products used in building roads, such as sand, gravel, asphalt, cement, crushed rock, etc. In fact, it is suggested that fill dirt is not a product at all. It urges that cases in which articles were held to be in commerce are distinguishable, for they all involve products requiring some processing, after which they are peculiarly suited for road construction and similar projects, while fill dirt is said to be a raw material having many other uses. We find in this no real distinction, as all are materials having monetary value, which are useful in the construction of roads and for other purposes. Yet they are all capable of becoming integral parts of roads. Earth in its original place, as it is said, may not be valuable as a distinct commodity, and becomes such only when moved to a place where it can be used. But this is also true of trees, minerals or other raw materials. When brought to the place where they are needed, they are not only commodities but their production may be for "commerce". See: *Tobin v. Johnson*, 8 Cir. 1952, 198 F.2d. 130 (rock quarried for roads and dikes held to be goods produced for commerce); *Emulsified Asphalt Products Co. v. Mitchell*, 6 Cir. 1955, 222 F.2d 913 (employees producing asphalt for highways held to be covered by the Act); *Mitchell v. Raines*, 5 Cir. 1956, 238 F.2d 186 (production of lumber for use in maintaining and repairing highways considered production of goods for commerce); *McComb v. Carter*, 8 WH Cases 498, 16 L.C. (CCH) No. 64,964 (E.D.Va., 1948, not officially reported) (hauling of sand and gravel to highway sites held production of goods for commerce.)" (footnotes omitted)

The Court therefore concludes that the overtime provisions of the FLSA extend to defendants' employees on the Skyline Drive project under the "in commerce" or the "production of goods for commerce" rationale.

■■■■ For similar reasons, the Court is of the opinion that services performed by the defendants' employees for the Woodsmoke Camping Resort and the American Outdoor Campgrounds are likewise "directly and vitally related to the functioning of a . . . facility of interstate commerce" as to be covered under the Act. Work performed on a facility which serves as a channel for the movement of goods or persons in interstate commerce is sufficiently related to commerce to be subject to the act. *Mitchell v. C. W. Vollmer & Co., supra.*

The Woodsmoke Camping Resort is clearly a facility of commerce in view of the large percentage of its patrons who are interstate travelers. The defendants' employees hauled fill dirt and base rock and did some grading for roads on a vacant site to which the existing campgrounds were to expand. Defendants' employees performed actual construction work on this site, including work on roads which were specifically constructed for travel by persons moving in interstate commerce. Thus, the employees performed services "directly and vitally related" to the functioning of the campgrounds as a facility of interstate commerce.

■■■ Employees engaged in construction of improvement to existing instrumentalities or facilities of interstate commerce are clearly covered under the *Vollmer* test. *Wirtz v. Atlantic States Construction Co.*, 357 F.2d 442 (5th Cir. 1966) (employees working on the extension of a wharf were engaged "in commerce"); *Archer v. Brown & Root, Inc.*, 241 F.2d 663 (5th Cir. 1957). Not only was the work performed directly

related to the improvement and functioning of the campgrounds, but also the activities performed by the defendants' employees were substantial in terms of the extent to which they prepared the site for use by the campground's interstate travelers. The Court therefore concludes that for the work performed on this project the defendants' employees so engaged are within the scope of the Act.

With regard to the work performed on the site of the American Outdoor Campgrounds, a closer question is presented. The majority of the work performed on this project was "new construction" performed prior to the time the park began operating.

Moreover, the work was not so substantial in nature, as defendants' employees merely hauled and dumped fill dirt, which was spread and graded by the paving subcontractor.

█ Nonetheless the Court is of the opinion that the work performed in the construction of this campground is likewise covered under the Act. Although the campground was to be a new facility, it is one which is intimately related to the movement of goods and persons in interstate commerce, and serves as an important improvement of existing channels of commerce.

Moreover, although the defendants' employees actually performed only the duties of hauling and dumping the fill dirt, the defendants had contracted to do substantially more work, but subcontracted the remaining spreading, grading and paving of roads. This was one continuous project involving the preparation of the campground for use by interstate travelers, and as an integral part thereof, the defendants' employees performed services directly related to the functioning of that facility, which were "more a part of it than isolated local activity".

█ The Court is of the opinion that with respect to their relationship to a facility of commerce, the employees here are similarly situated to those who worked on the Skyline Drive project. For the reasons

previously discussed therefore, the Court concludes this project is covered as well. *Cf., Mitchell v. Emala & Associates, Inc. supra.* The Court further is of the opinion that the employees on this project would also be covered under a "production" rationale. The fill dirt hauled and dumped by defendants' employees was utilized for laying the road base for the construction of streets in the campground which would clearly be used for a substantial amount of travel by persons moving in interstate commerce. Even though the streets in question would be strictly "local" in nature, the fact that virtually all of the travel thereon would be by persons moving in interstate commerce is sufficient to render them "instrumentalities of interstate commerce" for the purposes of the Act. *See, Compania De Ingenieros Y Contratistas, Inc. v. Goldberg,* 289 F.2d 78 (1st Cir. 1961); *Goldberg v. P & L Equipment Co. supra; Austford v. Goldberg, supra.* The Court therefore concludes that the defendants' employees are covered for the services performed on this project.

The defendants' employees also did substantial work in connection with the construction and establishment of two permanent mobile home parks, Forest Park (also known as Vista Village) and Twin Lakes Estates (Family Estates), including preliminary work for the construction of new streets and roads within the parks. Although similar in nature to the campgrounds discussed above, the Court is of the opinion that the nature of these projects is sufficiently distinguishable to mandate a contrary finding.

█ For both projects defendants' employees cleared and graded land and hauled fill dirt for use in constructing mobile home sites and roadways within the parks. In view of the permanent nature of the residents in the parks and the fact that no overnight trailers are permitted, the Court is of the opinion that the construction work performed in connection with these projects is not directly and vitally related to the functioning of an instrumentality or facility of interstate commerce, but rather is in the nature of purely local activity.

The work performed by the defendants' employees was entirely new construction, and, although it included work performed on roads and streets within the park complex, it is too remote to the actual functioning of an existing instrumentality of interstate commerce to be within the contemplation of the Act. The evidence is that the roads are all privately maintained by the mobile home subdivisions and the only likely interstate travel is the delivery of mail and packages which have traveled in interstate commerce. Although after such roads are constructed, and such use by postal vehicles is prevalent, any repair or improvement of the roads might well be covered under the Act, this does not require a finding that the construction of the roads is similarly covered. *Cf. Mitchell v. H. B. Zachry Co., supra,* 362 U.S. 310, 319, 80 S.Ct. 739, 4 L.Ed.2d 753.

The work simply is not sufficiently related to the *functioning* of any instrumentality or facility of interstate commerce as to be within the test established by the Supreme Court in *Vollmer.*

The Court finds further support for its view as to non-coverage for this work in the position taken by the Administrator of the Wage and Hour Division of the Department of Labor in his Interpretative Bulletin on the Construction Industry:

"Construction of other streets, which are not a part of a public road building program and are constructed on private property as a part of a new residential development, will not be considered covered until further clarification from the courts." 29 C.F.R. Section 776.30(f).

For the foregoing reasons, therefore, the Court concludes that no liability for coverage exists as to the employees engaged on these two projects.

■ Defendant James Whitehead and one of his employees were engaged in performing work directly and vitally related to the functioning of a facility of interstate commerce when they hauled and spread base rock for Allied Van Lines, an interstate carrier of goods. The spreading of fill and base rock for an area adjacent to the Allied Van Lines' facility for the later expansion of that company's parking facilities clearly constitutes work sufficiently closely identified to the functioning of an existing facility of interstate commerce as to be a "part of it, rather than isolated local activity."

The remaining projects worked on by defendants' employees involve primarily the question of coverage under the "production" phase of the statute. The question in these cases therefore is whether the defendants' employees performed work which was "closely related and directly essential to the production of goods for commerce". 29 U.S.C. Section 203(j).[18] In making its determinations, the Court must bear in mind the Supreme Court's warning in *Mitchell v. H. B. Zachry Co., supra,* that such action is the furthest removed from commerce in terms of the reach of the statute and must therefore be carefully applied so as not to encompass purely local activities.

■ For several existing facilities, defendants' employees performed preparatory construction work for the enlargement, expansion, or other improvements of existing facilities. Such work, like maintenance and repair, is necessary for the continued efficient operation of the facility as a unit and is therefore covered under the Act. *Archer v. Brown & Root, Inc., supra; Wirtz v. McDaniel, supra; Walling v. McCrady Construction Co.,* 156 F.2d. 932 (3rd Cir. 1946).

■ For the Ft. Myers News Press, a facility engaged in the production of goods for commerce, defendants' employees performed preparatory services for the expansion of a portion of that facility. Defendants' activities performed at the site were closely related and essential to the operations of the news plant and are therefore clearly covered.

■ For Romac Steel, a firm engaged in the production of goods for commerce, defendants' employees performed substantial services in connection with the expansion of

18. See also discussion in text pp. 1345–1346, *supra.*

that plant's facilities for parking and loading and a road to the plant, which would be used to carry goods being shipped in interstate commerce. Such work is similarly covered.

■ The same analysis is applicable to the work performed for the Ft. Myers Coca Cola Bottling Company, another facility engaged in the production of goods for commerce. Construction of a new parking lot for the expansion of such a facility is closely integrated with the functioning of the plant as a unified operation, and therefore any work performed by defendants' employees in connection with such covered construction work is likewise covered.

■ Defendants' employees also performed minimal services, consisting of hauling and spreading fill and base rock for the preparation of a parking lot and a building site, preliminary to the construction of a new facility at a vacant site for Industrial & Marine Hardware, to which facility the then existing operation was later moved. Industrial & Marine Hardware receives approximately 40% of its goods from interstate commerce which it sells to local hardware dealers. On balance of all relevant factors, however, the Court is of the opinion that the activities of the defendants' employees on this project are not sufficiently closely related to the production of goods for commerce to be within the contemplation of the Act.

The difficulty here is that the facility being constructed is not itself so intimately related to the production of goods for commerce as to render the construction of such a plant sufficiently related to or essential to production to be covered activity. Industrial & Marine "produces" no goods in the sense of manufacturing, processing, or even transporting materials which are sent in interstate commerce. It is connected to the production facility only as a link in the distribution chain "handling" and passing on to dealers goods produced elsewhere and shipped in interstate commerce. However, the evidence is that this business accounts for less than half of the materials sold by the company, and the Court therefore views

such activity as insufficient to find the initial construction of such a facility covered.

Although such activity might be sufficient for coverage of the employees working in the plant under the "enterprise" concept, and possibly even sufficient to extend coverage to employees engaged in the direct maintenance or repair of the facility, the Court is of the opinion that it is not sufficient activity to bring within the protective umbrella of the Act the defendants' employees engaged in insubstantial, preliminary activity in preparation for construction of the new facility. Cf., Mitchell v. H. B. Zachry Co., supra.

The factual situation here is distinguishable from that in *Wirtz v. McDaniel*, 325 F.2d 78 (8th Cir. 1963) wherein the Eighth Circuit extended coverage to employees engaged in constructing a new building for use by a national concern as a relocation and replacement of the existing facility. The company for which the building was erected in that case manufactured plumbing equipment which was distributed both nationally and internationally, and the plant was constructed specifically to meet interstate commerce production needs of that concern.

Also distinguishable is the Fifth Circuit's decision in *Schultz v. Instant Handling, Inc.*, 418 F.2d. 1019 (5th Cir. 1969), wherein the Court held that where more than 60% of defendant's waste-handling and trash removal service was rendered to companies which manufactured goods for shipment in interstate commerce, the defendant's employees were covered under the Act. There a large percentage of the defendant's activities were closely related to the functioning of an interstate manufacturer of goods—a far cry from the activities performed by the defendants' employees herein.

The Court is of the opinion that the situation here is more akin to that confronting the Supreme Court in *Mitchell v. H. B. Zachry Co., supra,* wherein the Court held that employees engaged in new construction of a dam to increase the reservoir for a local city water system were not covered

even though a substantial part of the water was to be used by producers of goods for interstate commerce.

The Court in *Zachry* fully analyzed the question of whether construction could ever be held sufficiently closely related and directly essential to production as to bring it within coverage under the Act, similar to the maintenance and repair of a covered facility. The Court stated:

> "Assuming arguendo that maintenance and repair of the completed dam would be covered employment it does not follow that construction of the dam therefore is. . . . The distinction between maintenance and repair on the one hand, and replacement or new construction on the other, may often be difficult to delineate but is a practical distinction to which law must not be indifferent. Its relevance here, where our purpose must be to isolate primarily local activities from the flow of commerce to which they invariably relate, lies in the close relation of maintenance and repair to operation, as opposed to replacement or new construction which is a separate undertaking necessarily prior to operation and therefore more remote from the end result of the process. As we held in *Vollmer,* that an activity is rightly called construction and is therefore distinct from operation, does not per se remove it from coverage. Construction may be sufficiently 'closely related' to production to place it in that proximity to 'commerce' which the Act demands as a predicate to coverage." 362 U.S. at 319, 80 S.Ct. at 745, 4 L.Ed.2d at 761.

The Court looked at the construction undertaken in that case and held the employees were not covered:

> "Here, however, neither a facility of 'commerce' nor a facility of 'production' is under construction. Operation of the completed dam will merely support production facilities, and construction of the dam is yet another step more remote." *Id.*

This Court is of the opinion that this situation involves a similar "support" facility for production. Industrial & Marine is a distributor for many goods, only a portion of which are connected with interstate commerce and its business is therefore not primarily directed to such "commerce". Like the dam in *Zachry,* it only "supports" the true production facility (the manufacturing plant) and the construction thereof is "yet another step more remote" from the production of goods for commerce. This Court therefore concludes that the activities performed by defendants' employees for construction of the Industrial & Marine Hardware plant are not covered activities.

 In contrast to the finding of no coverage for the work performed on the Industrial & Marine Hardware project, the Court is of the opinion that the substantial services of a similar nature performed for Castle Construction Company on the Huttig Sash and Door Company project are subject to the Act.

Huttig Sash and Door Company is a distributor of goods received almost exclusively from interstate commerce, which are distributed to lumber dealers rather than to ultimate consumers. It too is a link in the distribution chain; however, as its business is *primarily* the distribution of interstate goods, it is more closely connected to the production of such goods, rendering Huttig more closely related to commerce than Industrial & Marine.

Moreover, the work performed by defendants' employees on this project involved substantially greater preparatory construction activities, pursuant to a subcontract with Castle, including the ultimate paving of a parking lot and loading area at the site (which paving work was subcontracted to Harper Brothers). Further, as indicated by plaintiff's Exhibit 8A, a copy of the subcontract between Castle and defendants, the plant being constructed was a new manufacturing and office facility for an existing facility.

The defendants' work was an important initial step in the construction of this expansion facility by Castle, and therefore integrally related to the functioning of an

existing production facility. Such construction work which is functionally integrated with existing production facilities is sufficiently closely related and directly essential to production to be covered under the Act. *Wirtz v. McDaniel, supra; Archer v. Brown & Root, Inc., supra; Walling v. McCrady Construction Co., supra; see also* 29 C.F.R. Section 776.27(a), (c).

The construction of this facility for Huttig Sash and Door Company bears a similar relation to production as did the construction in *Wirtz v. McDaniel, supra,* and the trash-removal services in *Schultz v. Instant Handling, Inc. supra,* involving construction of more than a mere "support" facility for production. The Court finds therefore that the work performed on this project is "sufficiently 'closely related' to production to place it in that proximity to 'commerce' which the Act demands as a predicate to coverage." *Mitchell v. H. B. Zachry, supra.* Accordingly, the employees engaged in performing services on this project are covered.

The final group of projects concerns work connected with the preparation of three industrial park areas for subsequent construction of numerous industrial establishments. In each case, many of the businesses eventually located in the parks are engaged in the actual production of goods for commerce in the sense of manufacturing and shipping goods interstate or of transporting in interstate commerce goods which have been manufactured elsewhere.

In the case of each of the three industrial parks, Southside Industrial Park, Glades Lumber and Industrial Park Complex, and South Commercial Park, the defendants' employees performed various preparatory construction activities prior to the erection of any or most of the businesses later established in the parks. The Court is of the opinion that the preliminary construction activities performed by defendants' employees on certain of these projects are sufficiently closely related to production facilities and to facilities of interstate commerce to render the employees involved subject to the Act.

As previously noted by the Court, the effect of the Supreme Court's decisions in *Mitchell v. H. B. Zachry Company, supra,* and *Mitchell v. C. W. Vollmer Co., supra,* is to abrogate any per se exception to coverage for the new construction of any facilities. This fact alone, therefore, does not render the employees engaged in the preliminary construction of these industrial park projects not covered. Rather, a practical view of the relationship of the activities of the employees to the ultimate facilities constructed is necessary to determine the question of the applicability of the Act. As the Supreme Court held in the *Zachry* case:

"Construction may be sufficiently 'closely related' to production to place it in that proximity to 'commerce' which the Act demands as a predicate to coverage." 362 U.S. at 319, 80 S.Ct. at 745, 4 L.Ed.2d at 761.

On the Southside Industrial Park project, defendants' employees hauled fill and lime-rock for use by Pulte Construction Company in its construction activities, which were substantial—including clearing land, constructing parking lots and sewage systems, and erecting the buildings. The defendants' activities therefore constituted the initial stages of the on-going construction of several industrial park concerns engaged in commerce or the production of goods for commerce. As such, the work appears to this Court to have been sufficiently closely connected and vital to such facilities to be covered.

At the time defendants' employees began work, the United Telephone Company building had been constructed at the site. The work performed in preparing for construction of parking lots and roads utilized by that company can clearly be seen as essential to the functioning of such a facility and is therefore covered activity. There can be little question that the telephone company building, whether housing office personnel or communications equipment and operational personnel of the telephone company, is a facility of interstate commerce or so closely connected to commerce as to be an integral part of it, because of

the relationship of the work performed to the function of communication between the states—"commerce" within the meaning of the FLSA. 29 U.S.C. Section 203(b); *cf., Allen v. Atlantic Realty Co.,* 384 F.2d 527 (5th Cir. 1967); *Wirtz v. R. E. Lee Electric Company,* 339 F.2d 686 (4th Cir. 1964); *Walling v. McCrady Construction Company,* 156 F.2d 932 (3rd Cir. 1946).

■ Moreover, the work performed on this project was also done preliminary to the construction of other important facilities of interstate commerce. The evidence is that a United Parcel Service building was subsequently erected in the park, which facility was used for the sorting of packages, 75% of which traveled in interstate commerce. Engaging in the carriage and transportation of goods in interstate commerce clearly renders such facility an essential instrumentality of interstate commerce.

■ The facility being constructed would serve as an important addition or improvement to the nationwide network of United Parcel Service facilities and be an integral part of the interstate services provided by UPS in transporting goods in interstate commerce. As a result, the new construction of such a facility is clearly sufficiently "directly and vitally related to the functioning of the instrumentality of interstate commerce" as to be covered activity. *Wirtz v. R. E. Lee Electric Company,* 339 F.2d 686 (4th Cir. 1964) (work performed during construction of a building used as a Post Office, an instrumentality of commerce, is covered and not excepted as new construction).

The activities performed by defendants' employees in preparing for the construction of such a facility were an important step in the on-going process of construction of such

facility and are therefore sufficiently "directly and vitally related to the functioning of" an interstate facility to be subject to the Act. *Mitchell v. C. W. Vollmer, supra; Archer v. Brown & Root, Inc., supra; Walling v. McCrady Construction Company, supra.*

■ The services performed by defendants' employees intermittently during 1972, 1973 and 1974 on the Glades Lumber and Industrial Park Complex are likewise covered under the Act. Defendants' employees prepared building sites and roadway sites preliminary to the construction of numerous industrial concerns engaged in commerce or the production of goods for commerce and private roads utilized by said concerns for the hauling and delivering of commodities received or shipped in interstate commerce.

This work was performed for Glades Lumber Company [19] resulting in the improvement of its existing warehouse facilities on Hardee Street in the Complex,[20] and as an improvement of the system for distribution of its goods, the great majority of which are received in interstate commerce. As such, the construction project, and the work performed by defendants' employees thereon are covered as being closely related to existing production facilities and therefore essential to the production of goods for commerce. *Wirtz v. McDaniel, supra; Walling v. McCrady Construction Company, supra.*

■ Glades Lumber Company is clearly engaged in the "production" of goods for commerce within the meaning of the Act [21] in performing a function as a distributor for lumber received in interstate commerce from Georgia.

---

**19.** The job tickets for services performed on this project also indicate billings to Nevans & Simmons, owners of Glades Lumber, and others including Bob Dean Steel Buildings, but are all for similar type work, involving the clearing of land and the hauling, dumping and spreading of fill dirt for particular building sites, and paving of lots and roads (which was subbed to Harper Brothers). See Plaintiff's Exhibits 3, 4 & 9.

**20.** The Glades Lumber Complex location is circled and marked as # 3 in blue on Plaintiff's Exhibit 1.

**21.** 29 U.S.C. Section 203(j); *see* text p. 1336, *supra.*

The warehouse facilities at the Park are an important link in the distribution of its goods received in interstate commerce. Construction work performed for the expansion or improvement of the premises, including the grading of access roads, and parking lots, of such an existing covered production facility is sufficiently related and essential to the continued efficient operation of the covered facility to render such activity covered. *Archer v. Brown & Root, Inc., supra; Wirtz v. McDaniel, supra; Walling v. McCrady Construction Company, supra. See also* 29 C.F.R., Section 776.27.

Moreover, the preliminary construction work on the Glades Lumber Complex was also performed in preparation for the expansion and relocation of existing concerns involved in the production of goods for commerce, as well as for instrumentalities or facilities of interstate commerce, thereby placing such work in that proximity to commerce or production necessary to justify inclusion under the FLSA. *Mitchell v. Zachry, supra; Wirtz v. McDaniel, supra; Walling v. McCrady Construction Co., supra.*

The evidence was that Horn-Wilson, Inc., a wholesale distributor of plumbing supplies, 70–75% of which were received from interstate commerce, moved its existing offices to the Glades Industrial Park complex in June of 1972, shortly after defendants' work on its site was completed. Defendants' work therefore was an integral preliminary step in the construction of the new facilities for this existing production unit. Such construction is sufficiently "closely related and directly essential" to the production to support a finding of coverage on this project.

In May 1974, Edison Moving and Storage Company, an interstate carrier of goods, relocated its operation in the Glades Complex. Such a facility is directly engaged in the movement of goods in interstate commerce and therefore has a close and immediate tie with "commerce".[22] The new construction of replacement or expanding facilities for such an interstate carrier is clearly "directly and vitally related to the functioning" of such a facility of interstate commerce. *Archer v. Brown & Root, Inc., supra; Wirtz v. Atlantic States Construction Co., supra.*

The evidence further is that railroad sidings were also constructed leading into this industrial park. This enhances the close tie with commerce which the businesses in this park enjoy, and further emphasizes the connection and proximity of the work performed by defendants' employees with commerce and the production of goods for commerce.

Moreover, defendants performed substantial preliminary work in preparation for the paving of two roads in the complex, Sivan and Warehouse Streets (marked on Plaintiff's Exhibit 1) which serve as important instrumentalities of commerce in providing means for the carriage and distribution of goods to and from Glades Lumber Company and the other businesses located in the park. The Court concludes therefore, that the work performed by defendants' employees on the Glades Lumber and Industrial Park complex project is covered under the Act.

Finally, defendants' employees performed substantial preliminary construction activities for the site of a third industrial park, South Commercial Park. The work performed by defendants on this project bears a more tenuous relationship to the ultimate production facilities or facilities of commerce subsequently located in the park than the two above discussed industrial park projects.

Defendants began work on this project in June of 1973 and completed their work in 35 days. At the time of defendants' activities, the site was vacant, and there were no roads in the park, nor have any railroad sidings been subsequently constructed at the site. *The first building was not begun until the summer of 1974.* The Court finds therefore that the work performed by defendants' employees on this

22. 29 U.S.C. Section 203(b): "Commerce" means . . . transportation . . . between any State and any place outside thereof."

project is not sufficiently related to or integrated with the functioning of production facilities or facilities of interstate commerce as to render the employees engaged in the preliminary construction activities on this project subject to the Act.

There was no showing by the Secretary that the work performed by defendants' employees was designed as the preliminary step in the construction of replacement or improvements to the premises of an existing production facility, or as preliminary construction directly related to the functioning of an instrumentality or facility of interstate commerce. The evidence as to the future occupants of the park was that General Medical Corporation, a national corporation engaged in distributing medical supplies brought in interstate commerce, and Seablue Corporation, a national firm which distributes swimming pool supplies received in interstate commerce, moved into the park in September of 1974 and February of 1975, respectively, more than one year after defendants had completed their work at the site. There simply is insufficient connection of defendants' work to these subsequent production facilities to render defendants' employees on this project subject to the Act.

The relationship with commerce or production is more remote in the case of this industrial park, in contrast to the work performed on the Southside Industrial Park for Pulte Construction Co., which was then engaged in the erection of the buildings to house replacement facilities for existing production units and which work was for the expansion and improvement of the premises of a facility of interstate commerce then existing at the park, and the similar work performed for Glades Lumber Company in expanding its facilities and preparing the site for the relocation of other existing production units and for facilities and instrumentalities of interstate commerce.

As the Supreme Court recognized in *Mitchell v. H. B. Zachry Co., supra,* 362 U.S. at 321, 80 S.Ct. at 746, 4 L.Ed.2d. at 762, such fine distinctions as to coverage are a necessary concomitant of the manner in which Congress has implemented its statutory purpose:

"These are no doubt matters of the nicest degree. They are inevitably so in the scheme and mode of enforcement of this statute."

As the work performed at this site was not for any particular individual production or commerce facility, the Court is of the opinion that the general services provided lack the connexity to commerce necessary to satisfy the Act. No coverage therefore exists for the employees so engaged on this project.

## IV.

Having determined that certain of the construction projects undertaken by the defendants during the relevant time period involved in this case prior to May 1, 1974 are covered projects, the question then arises as to which employees of the defendants the benefits of the overtime provisions of the FLSA should be extended for the workweeks in question. This, however, raises again the question whether enterprise coverage applies to defendants' operations, now based upon the additional fact that during this period defendants employed persons who at different times performed work on several covered construction projects.

The issue is whether such activities were performed by defendants' employees on a sufficiently regular and substantial basis during this period to warrant a finding that defendants' operations actually constituted an enterprise engaged in commerce rather than an essentially local operation for the entire period. *See, Schultz v. Kip's Big Boy, Inc.,* 431 F.2d 530 (5th Cir. 1970); *Wirtz v. Ferguson,* 317 F.2d 343 (5th Cir. 1963).

However, there was no evidence adduced at trial from which the Court can reasonably determine what percentage of the work performed during this time period

on all of the projects of defendants was spent on the particular projects previously found by the Court to be covered. The Court is unable therefore to conclude from the evidence that defendants' activities subject to the Act were on a sufficiently regular and recurring basis to support a finding of enterprise coverage for all of the activities of defendants during the relevant period.

 The previous determination by the Court that certain of the projects undertaken by the defendants during the relevant time period are covered under the FLSA is sufficient however to sustain individual employee coverage for the particular workweeks in which employees performed activities on such covered operations. Moreover, the Court is of the opinion that enterprise coverage can be applied on an individual workweek basis so as to cover all defendants' employees for those particular workweeks in question.

Although initially the application of the enterprise concept on an individual workweek basis may appear anomalous, the Court is of the opinion that the language of Section 7 concerning payment of overtime compensation mandates such a result.

 The intent of Congress in adopting the "enterprise" concept was to extend the coverage of the Act to all employees of an employer if *some* of his employees met the commerce criterion. 2 *U.S.Code Cong & Ad News,* 87th Cong., 1st Sess. 1961, p. 1620; *Brennan v. Dillion,* 483 F.2d 1334 (10th Cir. 1973); *Brennan v. Greene's Propane Gas Service, Inc.,* 479 F.2d 1027 (5th Cir. 1973). Whether the employees of a particular employer meet the necessary commerce criterion on a regular basis or for only particular workweeks would seemingly make little difference so long as the statutory requirements were met and the employer was not exempt for any reason, as the intent of

Congress was to broaden coverage whenever some employees were covered. The Court is of the opinion that this includes individual workweek coverage as well.

This result appears to the Court to follow logically from the language of the pertinent statutory provisions. 29 U.S.C. Section 207(a)(1) provides in part as follows:

" . . . no employer shall employ *any of his employees* who *in any workweek* is engaged in commerce or in the production of goods for commerce, or *is employed in an enterprise engaged in commerce or in the production of goods for commerce,* for a workweek longer than forty hours . . ." (emphasis supplied)

Section 203(r) provides:

" 'Enterprise' means the related activities performed . . . by any person or persons for a common business purpose . . . . ."

Section 203(s) provides in pertinent part: [23]

" 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce . . . and which

(1) . . . is an enterprise whose annual gross volume of sales made or business done is not less than $250,-000.00; . . ."

Applying the above definitions, it is clear that the defendants' operations constitute an enterprise, and for the time spent on the projects previously determined by the Court to be covered under the Act, it was, alternatingly, also an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 203(s). The provisions of Section 207 therefore apply to prohibit defendants from failing to pay proper overtime to any of their

---

**23.** During the relevant time period prior to the 1974 amendments. *See* text accompanying note 3, p. 1335, *supra.*

employees "who in any workweek . . . (was) employed in (such) an enterprise engaged in commerce or in the production of goods for commerce . . ."

■ Accordingly, this Court finds that for the workweeks in which two or more of the defendants' employees were engaged in performing services in connection with any of the projects above determined by the Court to be covered under the Act, the defendants were required to pay the proper overtime charges required by 29 U.S.C. Section 207 to all employees employed by the defendants during those particular workweeks.

### V.

As previously noted by the Court herein, only the question of coverage of defendants' employees under the act for the time periods involved and the defendants' liability for payment of overtime in accordance with Section 7 was to be determined by the Court at this time. The Court having made its determinations as to the question of coverage and liability, there remain to be tried the issues of: (1) to which employees additional compensation is owed, and the total amount due to each; and (2) whether the record keeping provisions of the Act were also violated.

It would appear to the Court that, having resolved the issue of coverage, the remaining questions are ones which could be easily resolved between the parties by agreement and stipulation as to the exact amounts due and to whom, without the necessity of further trial time being expended by the Court. The Court however is prepared to go forward with a hearing on the remaining issues if the parties are unable to amicably reach a satisfactory settlement.

The plaintiff therefore is directed to notify the Court within thirty (30) days from date of this opinion as to whether the parties have been able to reach a satisfactory agreement and stipulation as to the amounts owed by the defendant. If no such settlement can be reached, the Court will reset this cause for further hearing.